**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**LUCA STERPETTI,**

                         **Plaintiff,**

**-vs-**                                                    **Case No.  6:04-cv-1843-Orl-31DAB**

**E-BRANDS ACQUISITION, LLC,**

                         **Defendant.**
_____

# ORDER

The Plaintiff, Luca Sterpetti ("Sterpetti") brought this action against the Defendant, E-Brands Acquisition, LLC ("E-Brands"), alleging copyright infringement under 17 U.S.C. section 501(a), and misappropriation of trade secrets under Florida's Uniform Trade Secrets Act, Florida Statute section 688.001, *et seq*.  This matter is presently before the Court on E-Brands' Motion for Summary Judgment, (Doc. 33), and Sterpetti's Opposition thereto, (Doc. 56).  The Court held a hearing on this matter on April 18, 2006, at which the parties presented oral argument.

**I.      Background**

        A. Facts

        Sterpetti was hired as an E-Brands employee on January 22, 2003.[1]  (Doc. 33, Att. 2 at 1). He was initially hired to work as a line cook in E-Brands' Timpano's restaurant in Orlando, Florida.[2]  (*Id*. at 2; Doc. 47 at 4).  His hiring was unrelated to the concept of a fresh pasta

_____

        [1] Sterpetti originally received an hourly wage of $10.50, which was increased to $11.25 on August 6, 2003.  (Doc. 33, Att. 2 at 2, 6).

        [2] E-Brands is a Florida limited liability company engaged in the restaurant business.  It owns the Timpano's Italian Chophouse restaurant ("Timpano's").

program.[3]  (Doc. 47 at 5; Doc. 45 at 1-2).  Sterpetti did not have a written employment contract.  (Doc. 44 at 5-6).

After a period of time, Sterpetti's supervisor, Rocky Tarantello, found that Sterpetti was "struggling" in his work on the production line, in that Sterpetti was unable to keep up with demands, so Tarantello approached him with the idea of working on a fresh pasta program.  (Doc. 47 at 5, 15).  Tarantello knew that Sterpetti had a "passion for pasta," and believed that he would be a good fit with that program.  (*Id*. at 5).  Tarantello thus presented Sterpetti with the concept of making pasta and producing the pasta program under the direction of Tarantello and another chef, Chef Robin.[4]  (*Id*.).  At the time Sterpetti was approached, Chef Robin had begun resourcing the necessary equipment for the pasta program.  (*Id*.).  The chefs intended to combine their ideas for a recipe with any ideas Sterpetti presented.[5]  (*Id*.).  Sterpetti believed that his part in the pasta program was to create a manual "for the goods (sic) of the company."[6]  (Doc. 44 at 21).

Sterpetti was enthusiastic about the opportunity.  (Doc. 47 at 5).  On August 25, 2003, Sterpetti was promoted from his position as line cook to begin working in food production and

---

[3] Rocky Tarantello ("Tarantello"), Timpano's concept chef, believes that Sterpetti was hired after Tarantello had begun initial discussions with other chefs regarding the creation of a fresh pasta program.  (Doc. 47 at 5).

[4] Sterpetti states that Tarantello and Chef Robin asked him if he could "make a pasta program for the company."  (Doc. 44 at 20-21).

[5] Tarantello asserts that after looking at many different recipes, including some of Sterpetti's, they eventually "ended up going with a combination of [his] and Chef Robin's recipes."  (Doc. 47 at 16).

[6] Sterpetti also states that he was to "create a manual for that company for their needs. In this case a fresh pasta program."  (Doc. 44 at 21).

preparation.[7]  (Doc. 33, Att. 2 at 2; Doc. 44 at 18).  Tarantello states that although Sterpetti's title of line cook did not change, his responsibilities changed in that he began working in Timpano's production kitchen to help with the production of pasta.[8]  (Doc. 47 at 5).

At that point, Tarantello presented the format of what he wanted done, including the training and production processes.  (Doc. 47 at 5-6).  Tarantello asked Sterpetti to create a manual for a pasta program, including a recipe for fresh pasta.  (Doc. 44 at 53-54).  This manual was to document the process used to make fresh pasta in Timpano's restaurants.  (*Id*. at 54).  Sterpetti presented several pastas to the chefs, who tried them and decided to make changes.  (Doc. 47 at 6).

After Tarantello had told Sterpetti about the concept and format of what he (Tarantello) wanted, Sterpetti presented Tarantello with a document entitled, "Making Pasta with Chef Luca." (the "First Manual").[9]  (Doc. 47 at 6).[10]  The recipe contained therein was Sterpetti's proposal for a pasta recipe.  (*Id*.).  Sterpetti created the First Manual for making pasta using the pasta machine Timpano's had purchased, and the Manual depicted that machine.  (Doc. 44 at 55).  Sterpetti only produced the First Manual after Tarantello had repeatedly asked him where the work was that he had been asked to produce and after Tarantello told him that he would be taken off of the pasta program.  (Doc. 47 at 6-7; *see also* Doc. 44 at 25, 28).

---

[7] As part of this promotion, Sterpetti's wage increased to $12.00 per hour.  (Doc. 33, Att. 2 at 2, 7; Doc. 44 at 4-5).

[8] Work in the production kitchen involves producing bulk recipes for the products of the restaurant.  (Doc. 47 at 5).

[9] Prior to creating the First Manual, Sterpetti had never before created a document or manual related to making fresh pasta.  (Doc. 44 at 17).

[10] Sterpetti filed a copyright application prior to giving the First Manual to Tarantello.  (Doc. 44 at 52).

The photographs in the Manual were taken in Timpano's kitchen, by Timpano employees who were working on company time, and were taken for the purpose of Timpano's use.[11]  (Doc. 47 at 9, 18).  These photographs show Timpano's supplies and equipment.  (Doc. 42, Att. 1 at 27; Doc. 44 at 46-47).  The creation of the Manual required approximately three or four days.  (Doc. 44 at 24).  Sterpetti spent time at work writing down the steps, processes and procedures for the pasta program so that he could incorporate them into the Manual.  (Doc. 44 at 24, 54).  He also spent time at Timpano's trying different ingredients for the pasta recipe.  (*Id*. at 56-57).  Sterpetti did not, however, perform the formatting of the document on Timpano's computer, nor did he perform that work "on Timpano's time."[12]  (Doc. 47 at 10).[13]

When Sterpetti presented the First Manual, Tarantello was upset because of the title and because Sterpetti had not laid it out in the manner in which Tarantello had instructed him.  (Doc. 47 at 7).  At that time, Tarantello explained to Sterpetti that it was "not his pasta . . . [T]his is Timpano's recipe. This is E-Brands['] property . . . ."  (*Id*.).  Tarantello also "walked through this whole misconception that [Sterpetti] seemed to have about this was something that [Sterpetti] was doing for [Timpano's]."  (*Id*.).  Tarantello made sure that Sterpetti clearly understood that the pasta

_____

[11] Sterpetti and his wife took the pictures at Timpano's while they were on the clock.  (Doc. 42, Att. 1 at 27).

[12] Sterpetti created this First Manual with the help of his wife, who assisted him with the pictures and with the language of the Manual.  (Doc. 42, Att. 1 at 16).  Together, they brought the materials to a printing and copying company for help formatting the document.  (*Id*. at 17-18).  Sterpetti and his wife did not perform any work for the First Manual on their home computer.  (*Id*. at 17).

[13] Tarantello believes that the taking of the pictures used, the creation of the food product, and the writing of the recipe were all performed on Timpano's time.  (Doc. 47 at 9).

recipe was to be Timpano's, not Sterpetti's.  (*Id*.).  He believes that Sterpetti "clearly understood" and was "very aware" that the pasta recipe was Timpano's.  (*Id*. at 7, 9).  Sterpetti admits that when he gave Tarantello the First Manual, he understood that the Manual was to be used by Timpano's, for its business, and for the training of employees making fresh pasta.  (Doc. 44 at 31-32, 33; Doc. 45 at 35-36).

Tarantello then made revisions to the First Manual, telling Sterpetti how certain things were to be laid out and how to do other things, and then told Sterpetti to make the revisions.  (Doc. 47 at 7; Doc. 44 at 30-31).  After that discussion with Sterpetti, Tarantello determined that they were "having trouble with the execution of the pasta and how it was cooking up," so he and Chef Robin "looked at the whole program, kind of revamped it, everything from the recipe to the holding and producing and cooking of it."  (Doc. 47 at 7).

Sterpetti produced a second document in which he made the changes to the recipe and pasta-making process Tarantello had required (the "Second Manual").[14]  (Doc. 47 at 8; Doc. 44 at 11, 13, 14, 18-19, 21, 27).  Sterpetti titled this Second Manual, "Making Pasta with Chef Luca Second Edition," which title Tarantello told him to remove.  (Doc. 47 at 8-9).  Tarantello then received a document without a title page.  (*Id*.).

Subsequently, a document entitled the "Timpano Fresh Pasta Program" was created (the "Timpano Manual").  (Doc. 47 at 11).  The Timpano Manual is similar to Sterpetti's Second Manual, and even contained the words "copyright pending" which Sterpetti had written in his Second Manual.  (*Id*.).  Tarantello discussed this copyright language with Sterpetti, and Sterpetti

---

[14] Sterpetti filed a copyright application for the Second Manual prior to giving it to Tarantello. (Doc. 44 at 9).

said that the pasta recipe was his recipe, at which point Tarantello explained that it was Timpano's recipe that included his (Tarantello's) and Chef Robin's changes.  (*Id*.).  Tarantello also explained that Sterpetti was performing the work on company time in order to produce the document for the company, and that it was E-Brands' property.  (*Id*. at 11-12).  Tarantello believes that Sterpetti understood.  (*Id*.).  Tarantello also believes that Sterpetti wanted to receive monetary gain for his work for "doing what he was already doing - - paid to be doing," despite the fact that no one ever promised him any monetary reward for his work on the Manuals.  (*Id*. at 11).  After that discussion, Sterpetti again approached Tarantello because he wanted money for helping with the program.  (*Id*. at 12).  Tarantello again explained that Sterpetti's job was to be a trainer for the program and to help with the rollout of the program to other locations.  (*Id*.).

The Timpano Manual differed from Sterpetti's First and Second Manuals in a number of ways.  During the process of creating a manual, Tarantello made changes to the materials Sterpetti submitted, and the final version incorporates Tarantello's changes.  (Doc. 47 at 17).  The Timpano Manual included specifications for cutting, drying and cooking pasta, and there was nothing "substantially similar" in either of Sterpetti's Manuals.[15]  (*Id*.).  Tarantello asserts that the recipe in the Timpano Fresh Pasta Program was different from Sterpetti's recipe in terms of both the nature and quantity of the ingredients, as well as the cooking and storing of the pasta.  (*Id*. at 12, 14).  However, the format of the Timpano Manual is the same, in that there is a recipe and photographs, with instructions next to the photographs.  (*Id*. at 13).

---

[15] The final version includes more detail about the pasta-making process than either version Sterpetti submitted.  (Doc. 47 at 18).

Sterpetti began traveling to other Timpano's restaurants to show people how to make the pasta. (Doc. 47 at 11). Tarantello states that this "was part of his new job description." (*Id*.). When he traveled to other restaurants, he brought extra copies of the manual, and told the employees at those locations to use the manual. (Doc. 44 at 34-35).

Sterpetti did not receive extra money for preparing the Manuals, nor did he receive a raise as a result. (Doc. 47 at 9).

B. Claims and Arguments

Sterpetti seeks relief on two grounds. In the first, he asserts a cause of action against E-Brands for copyright infringement under 17 U.S.C. section 501, alleging that E-Brands has reproduced, used and publicly displayed copies of his Manual. Second, he asserts a claim for misappropriation of trade secrets under Florida Statute section 688.004, alleging that E-Brands improperly acquired his trade secret (his pasta-making process) and then used and disclosed it without his consent.

E-Brands moves for summary judgment, arguing that the Manual is a "work for hire" and therefore E-Brands, not Sterpetti, owns the copyright, and that because E-Brands owns the copyright in the Manual, the process cannot be a trade secret and E-Brands cannot have misappropriated it.

**II.    Standard of Review**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the

burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).  Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[16]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments.  *Beal*, 20 F.3d at 458-59.  If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial.  *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

---

[16] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

**III.     Legal Analysis - Copyright Claim (Count I)**

Sterpetti has obtained Certificates of Registration from the Copyright Office for the

Manual.  (*See* Doc. 1, Atts. 3, 11, 12).  Under 17 U.S.C. section 410(c), those certificates are

"prima facie evidence of the validity of the copyright and of the facts stated in the certificate."

*Genzmer v. Pub. Health Trust of Miami-Dade County*, 219 F. Supp. 2d 1275, 1279 (S.D. Fla.

2002).  Thus, the existence of those certificates shifts the burden to E-Brands to overcome the

presumption of the validity of Sterpetti's copyright in the manual.  *Id.*

A. Work For Hire Doctrine

Section 201 of the Copyright Act ("Section 201") provides that copyright ownership vests

initially in the author of a work.  *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737

(1989); 17 U.S.C. § 201(a).[17]   One important exception to this rule addresses "works for hire."

Where a work is "made for hire,"

> the employer or other person for whom the work was prepared is considered the
> author for purposes of this title, and, unless the parties have expressly agreed
> otherwise in a written instrument signed by them, owns all of the rights comprised
> in the copyright.

17 U.S.C. § 201(b).  Therefore,

---

[17] Section 201(a) provides:

> (a) Initial Ownership - Copyright in a work protected under this title vests initially in
> the author or authors of the work. The authors of a joint work are coowners of
> copyright in the work.

17 U.S.C. § 201(a).  The author is "generally the party who actually creates the work, that is, the
person who translates an idea into a fixed, tangible expression entitled to copyright protection."
*Quintanilla v. Tex. Television Inc.*, 139 F.3d 494, 496 (5th Cir. 1998) (internal citation and quotation
omitted).

> when a work is made for hire, the employer, rather than the employee, is deemed
> the author. Any work prepared by an employee within the scope of his or her
> employment qualifies as a work for hire. The employer is the author of that work
> and thus the owner of the copyright.

*LaJoie v. Pavcon, Inc.*, 146 F. Supp. 2d 1240, 1246 n.5 (M.D. Fla. 2000) (internal citations omitted); *see also Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) ("The presumption of authorial ownership falls . . . if the work is made 'for hire'. . . ."); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) ("The creator of the property is the owner, unless he is an employee creating the property within the scope of his employment . . . ."). A work is defined as "made for hire" where it is "prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101.[18] There are thus "two elements to the work for hire definition: (1) the author must be an employee, and (2) the work must be prepared within the scope of the servant's employment." *Genzmer*, 219 F. Supp. 2d at 1279-80.

The Supreme Court has concluded that the term "employee" is to be "understood in light of the general common law of agency." *Cmty. for Creative Non-Violence*, 490 U.S. at 741. In this case, there is no dispute that Sterpetti was an employee of E-Brands when he created the Manual.

Thus, because Sterpetti was an employee and there is no written agreement governing the Manual,[19] the key issue in this case is whether Sterpetti created the Manual within the scope of his

_____

[18] Section 101 of the Copyright Act provides an alternative definition of "work made for hire," for works specially ordered or commissioned pursuant to an express written instrument signed by both parties stating that the work is one made for hire. 17 U.S.C. § 101. Given the facts of this case, that definition is not relevant to the Court's analysis.

[19] "In the absence of an express, written agreement, the rights to a work for hire generally vest in the employer rather than the employee-author." *Pavlica v. Behr*, 397 F. Supp. 2d 519, 524 (S.D.N.Y. 2005); *see also* 17 U.S.C. § 201(b); *Avtec Sys.*, 21 F.3d at 571 (work for hire exception is "overridden only by a clear writing reserving authorship rights to the employee"); *Bieg v. Hovnanian*

employment. *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 186 (2nd Cir. 2004). Although the Copyright Act does not define "scope of employment," "it is established that Congress intended to incorporate common law principles into the copyright statute." *McKenna v. Lee*, 318 F. Supp. 2d 296, 300 (E.D.N.C. 2002). An employee's conduct is within the scope of his or her employment "only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; and (c) it is actuated, at least in part, by a purpose to serve the master." *Avtec Sys.*, 21 F.3d at 571 (*citing* Restatement (Second) of Agency § 228 (1958)). This is a conjunctive test, and thus the party asserting that the work in question was made for hire must satisfy all three elements. *Genzmer*, 219 F. Supp. 2d at 1280.

B. The Scope of Sterpetti's Employment

*1) Whether Sterpetti was employed to perform this type of work*

Courts look to various clues to determine whether an employee acted within the scope of his employment, such as the employee's job description, the degree of control an employer had over the employee's project, and whether the employee relied solely on knowledge gained within the scope of the pertinent employment to create the work in question. *City of Newark v. Beasley*, 883 F. Supp. 3, 8 (D.N.J. 1995); *see also Moonstruck Design, LLC v. Metz*, 2002 WL 1822927 at *5 (S.D.N.Y. Aug. 7, 2002). An employee's act may be incidental to those acts which the employee was authorized to perform even if, considered on its own, it is an entirely different kind

─────────────────

*Enters., Inc.*, 157 F. Supp. 2d 475, 480 (E.D. Pa. 2001) ("The employer, rather than the employee/creator, is the copyright-owner of a work-for-hire, unless the employer and employee have expressly agreed otherwise in writing."). The employer must sign the writing for it to be effective. *Miller v. CP Chems., Inc.*, 808 F. Supp. 1238, 1243 (D.S.C. 1992). Unwritten understandings or writings not containing the signatures of both parties are not sufficient. *Id*. The burden is on the employee to demonstrate the existence of an appropriate writing. *Id*.

of act. *Genzmer*, 219 F. Supp. 2d at 1280; *Miller v. CP Chems., Inc.*, 808 F. Supp. 1238, 1243 (D.S.C. 1992). "To be incidental, however, it must be one which is subordinate to or pertinent to an act which the servant is employed to perform. It must be within the ultimate objective of the principal and an act which it is not unlikely that such a servant might do." *Miller*, 808 F. Supp. at 1243 (*quoting* Restatement (Second) of Agency § 229 comment b (1958)).

Sterpetti's job changed while he was employed by E-Brands. Although he originally worked in the preparation area or on "the line," Tarantello and Chef Robin asked him to "head up" the pasta program, and more specifically, Sterpetti was asked to create a manual for use at Timpano's restaurants. (Doc. 45 at 2-4; Doc. 47 at 19-21, 23-24; Doc. 48 at 4, 20-21). As part of his job, Sterpetti worked to train employees at other restaurants using the Manuals as part of that training. (Doc. 48 at 4). E-Brands exercised a fair amount of control over the creation of the Manuals, in that: (1) Sterpetti created the manuals at the behest of E-Brands employees, (Doc. 44 at 53-54; Doc. 45 at 52, 53-54); (2) Tarantello repeatedly asked Sterpetti to provide an initial version of the First Manual, (Doc. 44 at 25, 28); and (3) Sterpetti made changes to the Manuals based on feedback and directions from Tarantello, (Doc. 44 at 31; Doc. 45 at 10, 12, 14, 19-20, 22, 28, 30, 45, 52-53; Doc. 47 at 27, 30-33). Although Sterpetti was not hired specifically to work on the pasta program or to create the Manuals, clearly his job requirements changed during the course of his employment with E-Brands such that his job included, if not focused almost entirely on, those tasks. Therefore, the Court finds that Sterpetti was employed to perform the work related to the creation of the Manuals.[20]

---

[20] *Compare Martin v. City of Indianapolis*, 982 F. Supp. 625, 634 (S.D. Ind. 1997) (employee's creation of metal sculpture was not kind of work he was employed to perform, where his job responsibilities primarily entailed translating designs into forms suitable for metal fabrication, not creation of original works of art, and employer's business was primarily fabrication and design

*2) Whether Sterpetti's work on the Manual occurred during authorized time*

At issue here is whether Sterpetti performed work on the manual during the time period in which he was employed by E-Brands. *Genzmer*, 219 F. Supp. 2d at 1282. It appears that the actual assembly and formatting of the Manuals was done away from Timpano's while Sterpetti was not on the clock. (Doc. 42, Att. 1 at 17-18). However, because the Court has determined that the Manuals was of the type of work Sterpetti was employed to perform, Sterpetti will not be granted authorship rights solely on the basis that he performed a portion of the work while away from his place of employment and during times when he was not "on the clock." *Avtec*, 21 F.3d at 571; *see also McKenna*, 318 F. Supp. 2d at 301 ("[T]he fact that a work is created off-site, during non-working hours does not automatically remove the work from the scope of employment;" where first and third elements were satisfied, fact that design was created off-site during non-working hours was not determinative).[21] Stated simply, the work for hire doctrine "is not

---

incident to fabrication, not the sale of original artwork); *Roeslin v. Dist. of Columbia*, 921 F. Supp. 793, 798 (D.D.C. 1995) (developing computer software was not type of work plaintiff was employed to perform, where job description did not include computer programming, supervisor was not aware of plaintiff's programming skills upon his hiring, plaintiff was not hired to create program to assist entire office, and when plaintiff approached supervisor about writing program, supervisor actively discouraged plaintiff from doing so; fact that plaintiff used computers at work did not prove that programming was part of plaintiff's duties); *Beasley*, 883 F. Supp. at 8 (development of training manual was not kind of work defendant was hired to perform where employer had no control over his creation of the materials and defendant's position was not his source of knowledge).

[21] Sterpetti also argues that the fact that he not only performed most of the work on the Manuals outside of his normal working hours, but that he was not compensated either for his expenses or the hours he worked on the Manuals off-the-clock as an hourly employee indicates that he was not working within the authorized time limits of his job with Timpano's. At least one court has addressed this issue in a case involving an hourly (non-salaried) employee, and has rejected this argument, finding that:

> normally work done by an hourly employee outside of the workplace and for which he is not compensated would not be within the scope of employment. But, as in this case when the driving force behind the creation of the work is directly related to a specific product of the employer and the employee's job responsibilities, and for the primary

avoidable merely by performing the work in a separate location, or on non-work time." *In re Simplified Info. Sys., Inc.*, 89 B.R. 538, 542 (W.D. Pa. 1988); *Marshall v. Miles Labs., Inc.*, 647 F. Supp. 1326, 1330 (N.D. Ind. 1986).  Therefore, the Court will examine other facts related to Sterpetti's work on the Manuals.

Sterpetti performed a number of tasks essential to the creation of the Manuals at Timpano's while on company time: (1) he experimented with different ingredients and recipes while at the restaurant, (Doc. 44 at 56-57; Doc. 45 at 15-16); (2) the pictures for the Manuals were taken while he was working, (Doc. 44 at 22-23, 54); (3) the making of the food for the pictures was done on company time, (Doc. 47 at 35); (4) when he appears in pictures, he was working on company time, (Doc. 48 at 29); and (5) he wrote down the steps, processes and procedures for the pasta program while at work, (Doc. 44 at 24, 54-56).  Thus, not only did Sterpetti perform a number of tasks directly related to the creation of the Manuals while at work and while on company time, but all of Sterpetti's acts related to the creation of the Manuals were done while employed by E-Brands, and so the Court concludes that this element of the work for hire doctrine has been satisfied.  *See Vanderhurst v. Colo. Mountain Coll. Dist.*, 16 F. Supp. 2d 1297, 1307 (D. Colo. 1998) (even though plaintiff prepared materials on his own time and with his own materials, materials were connected with work he was employed to do, were reasonably incidental to his employment, and

---

benefit of the employer, such work may be within the scope of employment.

*Miller v. CP Chems., Inc.*, 808 F. Supp. 1238, 1244 (D.S.C. 1992).  The Court has determined that the creation of the Manuals was the type of work that Sterpetti was employed to perform, (*see* Section III(B)(1), *supra*), and that his work was motivated in large part to serve E-Brands, (*see* Section III(B)(3), *infra*), and thus the fact that he did not receive compensation for the work he performed on the Manuals outside of his normal work hours is not dispositive.  Moreover, Timpano's was not aware that Sterpetti was working "off the clock" while producing the Manuals.

creation of the materials was one method of carrying out objectives of employment, and thus material was work for hire).[22]

> 3) Whether Sterpetti's work on the Manual was motivated by a purpose to serve E-Brands

This element does not require that Sterpetti's sole motivation have been to serve his employer, only that his motivation to do so have been part of his motivation in his work on the Manual.[23] *Genzmer*, 219 F. Supp. 2d at 1282. In other words, E-Brands must demonstrate that Sterpetti was at least "appreciably motivated by a desire to further [E-Brands'] corporate goals" to satisfy this element. *Avtec*, 21 F.3d at 572 (internal citation and quotation omitted). In conducting this analysis, the Court looks not at any alleged benefit E-Brands derived from Sterpetti's work, but instead considers Sterpetti's state of mind as the primary determination, and may also consider his actions or other manifestations as evidence of his state of mind. *Martin*, 982 F. Supp. at 634.

This analysis must start with the fact that Timpano's/Tarantello asked Sterpetti to create the Manuals for the pasta program for use in Timpano's restaurants. (Doc. 44 at 53-54; Doc. 45 at 52, 53-54). Tarantello repeatedly asked Sterpetti to produce an initial draft of the First Manual, (Doc. 44 at 25, 28), and after producing the first draft, Sterpetti made changes to the First Manual at Tarantello's request, (Doc. 44 at 31; Doc. 45 at 10, 12, 14, 19-20, 22, 28, 30, 45, 52-53; Doc. 47 at 27, 30-33). Sterpetti took pictures for the purpose of using them in the manual, those pictures

---

[22] *Compare Quinn v. City of Detroit*, 988 F. Supp. 1044, 1051 (E.D. Mich. 1997) (second factor lacking where employee created program at home on own time using software purchased with his own funds; also noting that creation of program was not the type of work employee was hired to perform); *Roeslin*, 921 F. Supp. at 798 (employee's development of program was not substantially within authorized time limits, where employee spent three thousand hours outside of work creating program at home using computer purchased with personal funds).

[23] At the same time, however, copyright will not vest in an employer solely because the subject matter of the work in question "bears upon or arises out of the employee's activities for his employer." *Avtec*, 21 F.3d at 572 (internal citation and quotation omitted).

show Timpano's supplies and equipment, and the Manuals describe the equipment that would be necessary for use in Timpano's business operations.  (Doc. 42, Att. 1 at 27-28; Doc. 44 at 31-32, 55; Doc. 45 at 42-43).   Sterpetti understood that the Manuals were to be used to train employees in Timpano's restaurants.  (Doc. 44 at 33).  Sterpetti was not paid any additional amounts for creating the Manuals.  (Doc. 44 at 54; Doc. 45 at 50).  Tarantello explained to Sterpetti, on several occasions, that the pasta recipe was Timpano's, and that the program was E-Brands' property. (Doc. 47 at 27, 34; Doc. 48 at 3-4, 5).  Notably, the Manuals are unique to Timpano's and are, realistically, only useful to them because the Manuals feature processes developed based on, and using, Timpano's equipment, and incorporate suggestions and ideas for the recipe and process required by Timpano's chefs and owner.  This evidence all strongly suggests that Sterpetti's goal in creating the Manuals was to serve Timpano's interests.

Most importantly, Sterpetti has repeatedly acknowledged, in various ways, that the work he did was for Timpano's: (1) he was asked to make the pasta program "for the company", (Doc. 44 at 20-21 and Doc. 45 at 2, 43-44); (2) he created the Manuals for Timpano's "for their needs" for the fresh pasta program, (Doc. 44 at 21); (3) the Manuals were to be used "[f]or the goods (sic) of the company," (Doc. 44 at 21; Doc. 45 at 39 (he "was doing some good things for the company")); (4) he has stated that "I was putting together a manual for Timpano," (Doc. 44 at 61; *see also* Doc. 45 at 3); and (5) he understood, when he gave the Manuals to Tarantello, that it would be used for the good of the business, he was aware that the purpose of the Manuals was to train employees to make fresh pasta, and he knew that other employees would be able to look at the Manuals, (Doc. 44 at 32; Doc. 45 at 37).[24]

---

[24] *See Cramer v. Crestar Fin. Corp.*, 67 F.3d 294, *5 (4th Cir. 1995) (unpublished opinion) (noting that employee's candid concessions that his work served his employer's interest "amply

Perhaps the only facts weighing in Sterpetti's favor are that he filed for Certificates of Registration with the Copyright Office before presenting the Manuals to Tarantello, and that he sought compensation on at least one occasion for producing the Manuals, from which it might be inferred that Sterpetti was acting in his own interests.  Sterpetti expected extra compensation for his efforts related to the Manuals, and asserts that he had an agreement with Timpano's whereby he would create the fresh pasta process and, in exchange, he would be compensated in the form of a promotion.  Based on this, he argues that he actually performed the work on the manual solely for his own benefit, in that he only did that work because he thought he would benefit by being promoted (and, presumably, would not have done the work without such a promise of promotion). The Court disagrees.  The facts demonstrate that Sterpetti agreed to create what amounts to a work for hire, he copyrighted the material to protect his purported right to compensation for creating that work, and his complaint now is that he did not receive the expected compensation.   Without commenting on the merits of such a claim, the Court notes that Sterpetti's arguments make his position seem more akin to a breach of contract claim than a copyright infringement claim.

The overwhelming weight of the evidence shows that Sterpetti created the Manuals at Tarantello's behest, knowing that they would be used specifically for Timpano's business, and he has repeatedly specifically acknowledged that he created the Manuals to benefit Timpano's in creating their fresh pasta program.  Thus, regardless of any ideas Sterpetti may have held about gaining personal benefit from creating the Manuals (creating at least a partial motivation to serve his own interests), the Court concludes that Sterpetti's creation of the Manuals was, at the very

---

support[ed], indeed compel[led], the conclusion that" the employee was motivated at least in part to serve his employer's interests).

least, appreciably motivated to serve Timpano's business objective of instituting a fresh pasta

program.  *See Genzmer*, 219 F. Supp. 2d at 1282-83 (plaintiff was motivated, at least in part, to

serve employer when developing software where plaintiff tailored program to serve employer's

needs, received direction as to presentation of finished product and as to addition and deletion of

certain items, and final versions was used by employer to employer's benefit); *Quinn v. City of

Detroit*, 988 F. Supp. 1044, 1051-52 (E.D. Mich. 1997) (employee developed software, at least in

part, to serve employer, where employer was not doing adequate job of meeting litigation

deadlines, and employee, in seeking to improve performance, designed litigation management

software and installed it on computers at work); *Miller*, 808 F. Supp. at 1243-44 (employee's

development of computer programs was actuated, at least in part, by purpose to serve employer

where after employee created initial program to simplify his job and eliminate errors, employer

expressly asked him to continue to develop programs, and ultimate purpose of developing

programs was to benefit employer by maximizing efficiency).[25]

     C) Conclusion Regarding the Work for Hire Doctrine

     Because all elements of the doctrine are satisfied, the Court concludes that: (1) Sterpetti

created the Manuals within the scope of his employment with E-Brands; (2) the Manuals are works

for hire; and (3) thus E-Brands is the "author" and proper owner of the copyrights therein.  *See

McKenna*, 318 F. Supp. 2d at 301 (where plaintiff's duties included printing signs and design work

at the request of his employer, when plaintiff created a design in response to employer's request, in

---

[25] *Compare Beasley*, 883 F. Supp. at 9 (employee was not motivated by desire to serve employer when creating training manual where no evidence showed that his motivation was to benefit employer, and he testified that he hoped that the materials would be used by a number of different cities).

course of employment, and with purpose to serve his employer, under totality of circumstances,

design was work for hire); *Vanderhurst*, 16 F. Supp. 2d at 1307.[26]

## IV.     Legal Analysis - Trade Secret Claim (Count II)

Sterpetti has asserted a claim under Florida's Uniform Trade Secret Act, Florida Statute

sections 688.001 *et seq.*, for misappropriation of trade secrets.   The elements of such a claim are

that

> (1) the plaintiff possessed secret information and took reasonable steps to protect its
> secrecy and (2) the secret was misappropriated, either by one who knew or had
> reason to know that the secret was improperly obtained or by one who used
> improper means to obtain it.

*Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla.

2001); *see also Tedder Boat Ramp Sys., Inc. v. Hillsborough County, Fla.*, 54 F. Supp. 2d 1300,

1302 (M.D. Fla. 1999) (two essential elements are that "(1) there must be an actual trade secret

and (2) there must have been a breach of confidence"); Fla. Stat. § 688.002.[27]

---

[26] *Compare Pavlica*, 397 F. Supp. 2d at 525-26 (questions of fact remained regarding whether creation of manual was kind of work plaintiff was hired to perform and whether plaintiff's purpose in creating manual was to serve employer, where jury could find that plaintiff designed manual independently of employer and without assistance of or direction by employer, plaintiff did all work at home on his own time and without compensation from employer for manual, and plaintiff did not design materials specifically for use by employer); *PFS Distribution Co. v. Raduechel*, 332 F. Supp. 2d 1236, 1248 (S.D. Iowa 2004) (software system was not work for hire where employee who developed it was hired as truck driver and operations manager and developing software was not within his job description, and subsequent position as sales manager did not require him to develop software, employee created the software on nights and weekends away from work and sold or licensed the system to other businesses, employer did not ask him to tailor the software for employer's use, and employee only modified his program to help employer's operations run more smoothly).

[27] Florida's Uniform Trade Secrets Act defines "trade secret" as

> information, including a formula, pattern compilation, program, device, method,
> technique, or process that:
>      (a) [d]erives independent economic value, actual or potential, from not
>      being generally known to, and not being readily ascertainable by proper

*1) Whether Sterpetti has demonstrated that he possessed a "trade secret"*

To constitute a trade secret, the information the plaintiff seeks to protect "must derive economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy."[28] *Del Monte*, 136 F. Supp. 2d at 1291; *see also Lee v. Cercoa, Inc.*, 433 So. 2d 1, 2 (Fla. 4th DCA 1983) (trade secret "is property which its owner makes use of to the exclusion of others").  In an action for misappropriation of trade secrets, the plaintiff bears the burden of demonstrating that the information it seeks to protect is a trade secret and that it has taken reasonable steps to protect that secrecy.  *Am. Red Cross v. Palm Beach Blood Bank,* Inc., 143 F.3d 1407, 1410 (11th Cir. 1998); *Border Collie Rescue, Inc. v. Ryan*, --- F. Supp. 2d ----, 2006 WL 485117 at *4 (M.D. Fla. Feb. 28, 2006).

Sterpetti makes a number of allegations in his Complaint, including that he kept the recipe as a well-guarded secret because he planned to use and/or sell it in the future, his recipe and

---

means by, other persons who can obtain economic value from its disclosure or use; and
(b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

[28]

Trade secrets are defined in the Restatement of Torts . . . as information (1) which is used in one's business, (2) which gives him an opportunity to obtain an advantage over competitors who do not know or use it, (3) which is secret, i.e., not common knowledge of the trade, (4) which is maintained in secrecy by the owner, (5) which is of value to a competitor, and (6) which was acquired at some expense to or effort by its owner.

*Keystone Plastics, Inc. v. C&P Plastics, Inc.*, 340 F. Supp. 55, 74 (S.D. Fla. 1972); *see also Portionpac Chem. Corp. v. Sanitech Sys., Inc.*, 217 F. Supp. 2d 1238, 1252 (M.D. Fla. 2002) (Florida law applies same definition).

process have economic value, and before being offered a promotion he kept the recipe secret and refused to disclose it.  (Doc. 1 at 2, 6, 7).  None of these allegations are supported by evidence.[29] In addition, Sterpetti has offered no evidence demonstrating that he undertook "reasonable efforts" to maintain the secrecy of his recipe and process for making fresh pasta:[30] he never suggests that he conveyed to anyone at E-Brands that his recipe was a secret or that he disclosed his ideas in confidence; he did not enter into any type of agreement, written or spoken, regarding the confidentiality of his recipe; he does not suggest the existence of a tacit understanding between the parties regarding the alleged secrecy of his ideas; nor he does suggest that it may reasonably be inferred from the circumstances that the information was confidential.[31]   Finally, Sterpetti has not

_____

[29] Indeed, the exact nature of the "trade secret" allegedly involved in this case is not entirely clear.  Sterpetti does not clarify whether the trade secret is a particular recipe, or a method of making pasta, or the entire fresh pasta-making process involved in this case, nor is it clear how something such as a recipe for pasta, or a process for making pasta, could be considered secret or uncommon knowledge within the foodservice industry.

[30] Although Sterpetti did file for Certificates of Registration prior to providing the Manuals to Tarantello, he does not argue that these Certificates demonstrate an attempt to maintain the secrecy of his recipe and process.

[31] *See Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551, 562 (N.D. Cal. 1999) (granting summary judgment on misappropriation claim where plaintiff disclosed information yet failed to impose any duty of confidentiality on those to whom it disclosed alleged trade secrets and failed to indicate that those materials were confidential or trade secrets); *compare Liberty Am. Ins. Group, Inc. v. WestPoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1285 (M.D. Fla. 2001) (plaintiff took reasonable efforts to maintain secrecy of software by restricting access to its programmers and to third parties who had licensing agreements with plaintiff, and requiring employees with access to software to sign confidentiality agreements); *Picker Int'l Corp. v. Imaging Equip. Servs., Inc.*, 931 F. Supp. 18, 30 (D. Mass. 1995) (reasonable measures to protect information included placing manuals in binders with prominent legends declaring the information they contained to be proprietary and notifying recipients that information could not be copied, disclosed or used without permission, placing copyright notices and proprietary legends on the cover of service manuals and other documents, issuing memorandum reminding employees of obligation to protect confidential information and directing them not to disclose such information without written permission, and requiring employees

offered evidence to demonstrate that his process or recipe derived economic value from its secrecy, or that he acquired his idea or knowledge by any type of effort or expense on his part. Therefore, Sterpetti has failed to meet his burden of demonstrating the existence of a trade secret and his efforts to maintain its secrecy.[32]

### 2) Whether E-Brands misappropriated Sterpetti's idea

Giving Sterpetti a generous benefit of the doubt, and assuming for the purposes of this analysis that he brought a trade secret to the table, he still cannot prevail because the evidence does not demonstrate that E-Brands misappropriated that information.  A "misappropriation" is the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means ...."  Fla. Stat. § 688.002(2)(a); *see also Tedder*, 54 F. Supp. 2d at 1302.  "The use of someone else's idea is not automatically a violation of the law.  It must be something that meets the requirements of a 'trade secret' and has been obtained through a breach of confidence."  *Tedder*, 54 F. Supp. 2d at 1302 (internal citation and quotation omitted).

Sterpetti asserts that E-Brands misappropriated his ideas when they represented to him "that they would promote him to Speciality Chef, Preparation Supervisor and Chef Trainer as well as give him credit in exchange for his idea," (*see* Doc. 1 at 7), but then failed to promote him. Tarantello states that Sterpetti wanted some sort of compensation for his work on the program, but

---

to execute confidentiality agreement); *Sepro Corp. v. Fla. Dept. of Envtl. Prot.*, 839 So. 2d 781, 784 (Fla. 1st DCA 2003) (in context of delivering information to state agency, "trade secret owner who fails to label a trade secret as such, or otherwise to specify in writing . . . that information which it contends is confidential . . . [and] is not to be disclosed, has not taken measures or made efforts that are reasonable under the circumstances to maintain the information's secrecy").

[32] Indeed, the fact that E-Brands owns the copyright in the Manuals seems logically inconsistent with Sterpetti's claim that the information contained therein constitutes a trade secret.

flatly denies that any promises were made to Sterpetti about either a promotion or a monetary reward.  (Doc. 47 at 44-47).  Sterpetti offers no concrete evidence regarding the existence of a promise of promotion in exchange for providing Timpano's with his recipe.  Instead, he acknowledges that he had no written employment contract with Timpano's, and only offers his "understanding" of the relationship between himself and Timpano's.[33]  At best, he states that "[t]he fresh pasta making process was embodied in the manual and disclosed to Timpano Italian Chophouse after the (sic) Rashid Choufani, Robby Strutter and/or Rocky Tarantello promised me a promotion around October 2003."  (Doc. 45, Att. 26 at 2).  Sterpetti's general statement about his expectation of a promotion and his somewhat vague assertions about his beliefs, unsupported as they are by other evidence regarding the terms of the agreement, such as when the alleged promise was made, who specifically made the promise, or to what position Sterpetti was to be promoted, are simply insufficient to carry his burden at the summary judgment stage of demonstrating the existence of a misappropriation.[34]  Accordingly, because there is no evidence that E-Brands misappropriated anything from Sterpetti, his claim for misappropriation of trade secrets fails.[35] *See Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 264 F. Supp. 2d 1064, 1077 (S.D.

---

[33] Sterpetti repeatedly states that he "understood" that an "agreement" existed, and that he "thought" he would be promoted, but he never goes any further.  *(See* Sterpetti's deposition at Doc. 44 at 20-21, 63; Doc. 45 at 2-3, 38-39).

[34] *See Keystone Plastics*, 340 F. Supp. at 73-74 (noting that plaintiff has burden of establishing, *inter alia*, that defendant improperly acquired trade secret through breach of confidential relationship).

[35] Sterpetti also alleges that E-Brands misappropriated his secret recipe when Tarantello refused to return all copies of the Manuals and to stop using Sterpetti's recipe and process. However, he has offered neither factual nor legal support for this assertion, and thus the Court declines to address it here.

Fla. 2003) (defendant did not misappropriate registry, where there was no allegation that defendant knew or should have known that it was confidential trade secret guarded by plaintiffs, or that it had been acquired through improper means); *Vasquez v. Ybarra*, 150 F. Supp. 2d 1157, 1172 (D. Kans. 2001) (summary judgment in favor of defendant was proper where plaintiff failed to present any evidence on efforts to maintain secrecy and failed to show misappropriation).

## V.   Conclusion

For the reasons discussed herein, the Court finds that the Manuals constituted a work for hire, and that E-Brands did not misappropriate a trade secret from Sterpetti.  Accordingly, it is

**ORDERED THAT** E-Brands' Motion for Summary Judgment (Doc. 33) is GRANTED. This case is removed from the July 5, 2006 trial calendar, and the Clerk is directed to enter judgment for E-Brands and to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on April 20, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

-24-